IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ANJELITO GUAJARDO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs | ) CIVIL ACTION NO. 98-RRA-2235-S |
| | ) |
| THE CITY OF SNEAD, ALABAMA; | ) |
| LEE WADE, in his individual and | ) |
| official capacity as a City of Snead | ) |
| Police Officer; and EZRA POOLE, | ) |
| in his individual and official capacity | ) |
| as Police Chief of the City of Snead, | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION
(Re City of Snead and Officer Wade's motion for summary judgment, ct. doc. 19;
Chief Poole's motion for summary judgment, ct. doc. 27)

The plaintiff brings this action pursuant to 42 U.S.C. § 1983. On or about November 2, 1996, the plaintiff was shot by Officer Lee Wade of the Snead police department. The plaintiff alleges that Wade was acting under the direction and control of the City of Snead and Chief Poole, in accordance with official policy, practice, or custom of the City.[1] The plaintiff also asserts that the City of Snead and Poole failed to train, supervise, or control their police officers. The complaint further

---

[1] The allegations made against Chief Poole were originally made against Chief Tim Kent. When the plaintiff learned that Kent had not assumed his duties until after the shooting, the plaintiff was allowed to substitute Poole in place of Kent.

states that Chief Poole directly or indirectly approved and ratified the excessive force used by Officer Wade. The above-stated motions for summary judgment, along with supporting and opposition briefs, have been considered.

<u>Summary Judgment Standard</u>

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P.56. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some

evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett v. Parker*, 898 F.2d at 1532 (citation omitted). "Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co.*, 420 F.2d at 1213. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Impossible Electronic [Techniques, Inc. v. Wackenhut Protective Systems, Inc.*], 669 F.2d [1026] at 1031 [(5th Cir.1982)]; *Croley v. Matson Navigation Co.*, 434 F.2d 73, 75 (5th Cir.1970)." *Treister v. City of Miami*, 893 F. Supp. 1057, 1059 (S.D. Fla. 1992).

<u>Evidence</u>

The pertinent facts, though severely in dispute, are not long. After being beaten up outside a bar, the plaintiff drove, while intoxicated, to the home of his

former wife. Snead police officer Lee Wade and his partner, reserve officer John Bryant, observed the plaintiff greatly exceeding the speed limit. They followed the plaintiff's car, intending to pull him over. When the plaintiff stopped in the parking lot of his former wife's apartment building, the officers stopped their police car "behind [the plaintiff's], not directly behind, but sideways." *Wade Deposition* at 49. There is such a sharp divergence in the evidence as to what happened next that some testimony is clearly a complete fabrication.

The plaintiff testified at his deposition that he did not know that a police car was following him. The plaintiff first realized the officers' presence when, after he stopped, he saw a "spotlight." The plaintiff got out of his car, put his arms up, and was promptly shot by Wade, without any reason whatsoever. The plaintiff testified:

> A. All I can recall is as soon as I got out I put my hands up and I had been shot.
>
> Q. You didn't get any altercation or struggle with this officer?
>
> A. No, sir I did not.
>
> Q. Didn't try to seize his weapon?
>
> A. No, sir.
>
> Q. Was anyone else with this officer, any other officer?
>
> A. I never seen him face to face.
>
> Q. Is you answer there was anybody else as far as you know, or do you know?

A.  No, as far as I know there wasn't.

Q.  Did he have on a uniform?

A.  As far as I know. I didn't see no officer.

Q.  How close did you get to him Mr. Guajardo?

MR. HOLDEFER: At what point in time?

Q.  When you got out of your vehicle, how close did you get to him?

MR. HOLDEFER:   If you know.

A.  I fell down right beside my door.

Q.  Did you ever recognize him?

A.  No, sir.

Q.  You didn't know that and don't know it till yet; is that right? I mean at the time you say you got shot; is that right? You didn't know he chased you?

A.  I didn't know.

Q.  Now what happened after you say you go shot?

A.  I asked, why did you shot me. I asked that question.

Q.  Who did you ask that to?

A.  Whoever shot me.

Q.  This gentleman here, for the record Mr. Wade is present in this deposition. I'm point to Mr. Wade. Did you ask that gentleman?

A.  No, I hit my knees and I said, why did you shoot me?

Q.  I know. Who did you ask that question to?

A.  Whoever, shot me.

5

>    MR. HOLDERFER: If you know who. If you don't know, say I don't know who I asked that.
>
> A.   I don't know who I asked that.

*Plaintiff's Deposition*, pp. 37-45.

Wade testified that, in order to determine whether anyone else was in the plaintiff's car, he pointed a flashlight into the car as he approached it. He further stated:

> I was near the trunk of the car nearing it and saw it through the side glass and or back glass. I know I seen it through the little rectangle glass behind the passenger side, behind the driver, the passenger side behind the driver, that window. There is a little triangle window there and I saw it through there.

*Wade Deposition* at 70. In response to seeing the hammer, Wade drew his weapon. Wade was questioned as to his distance from the plaintiff when he drew his gun:

> Q.   How far were you from him when you had your weapon drawn?
>
> A.   I was still at the trunk.

*Wade Deposition* at 71. Wade described what happened next:

> A.   He just stood there so I advanced towards him real slowly and grabbed him with my right hand.
>
> Q.   Where did you grab him?
>
> A.   I either grabbed him or tried to push him to the side to get him out of the door on the shoulder.
>
> Q.   Did you grab him or did you push him?
>
> A.   I don't know. I was just getting him away from the car door.

6

>   Q.   So what happened after you either pushed him or grabbed him on the right-hand side?
>
>   A.   On the right-hand side?
>
>   Q.   On his right-hand side, I'm sorry.
>
>   A.   No, on his left-hand side. I pushed him to the right from his left -- no I pushed him on his left shoulder to his right.

*Id.* at 72-3. Wade testified that the plaintiff then grabbed his gun. "At that time, his hands come up and latched onto my wrist or my left hand and my gun." *Id.* at 73-74. The plaintiff and the defendant struggled, and they went to the ground. When asked to tell what happened after they fell to the ground, Wade testified: "The next thing I recall is trying to twist my weapon out of his hand and finally got my finger inside the trigger and pulled it." *Id.* at 78.

The defendants assert that the plaintiff's version of events cannot be believed:

>   The deposition of Plaintiff Guajardo is beyond the pale of credibility in that, while the Plaintiff maintains he was on his hands and knees with his hands up when the shooting occurred, the evidence clearly shows that there were powder burns on the plaintiff's shirt and clothing which would be impossible if the incident occurred as the plaintiff says it did."

*Defendants' Brief In Support Of Motion For Summary Judgment* at 3. The forensic report states that "during test firing it was noted that the Ruger pistol with submitted ammunition would not deposit gun powder at a muzzle to target distance greater than 54 inches."

7

Finally, the plaintiff points out that Wade had been an officer on the Snead police force for four or five months before the shooting and had not been given any training with respect to the use of lethal force, and Poole states in his affidavit that his employment with the Town of Snead ended on October 31, 1996, two days before the shooting in question.

### Claim Against Wade

The plaintiff claims that excessive force was used by Officer Ward when he shot the plaintiff. Police officers can be held liable for violating a clearly established constitutional right. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Lassiter v. Alabama A&M University*, 28 F.3d 1146, 1150 n.3 (11th Cir. 1994)(en bank). It is clear that on or about November 2, 1996, shooting an unresisting person while his hands were raised is a violation of the United States Constitution. *Tennessee v. Garner*, 471 U.S. 1 (1985).

As to the defendants' contention that the forensic evidence makes the plaintiff's version of the facts simply unbelievable, the gun could have been as far away from the plaintiff as four and one-half feet when it fired. Therefore, it cannot be said, as a matter of law, that the evidence could not support a finding that the plaintiff was shot while holding up his hands and offering no resistance. The fact finder will have credibility findings to make. The jury will have to

disbelieve either the plaintiff's or the police officers' entire account of the shooting.

### Claims Against City of Snead/Chief Poole

The plaintiff contends that Wade was not properly trained in the proper use of lethal force, which would, in this case, be a gun. He asserts that such training was the responsibility of both the City and the police chief. The plaintiff states: "Since the plaintiff has established a violation by Officer Wade, the policies and procedures of The City of Snead Police Department and Chief Poole can be called into question." *Plaintiff's Brief In Response* at 6.

In § 1983 actions, a city or a police chief can be held liable for the excessive use of force by an officer, if the city or the chief failed to do something it or he should have done, or did something that it or he should not have done, such as policy or a failure to train properly, and if that commission or omission contributed to the use of excessive force. *City of Canton v. Harris*, 489 U.S. 378 (1989); *See Monell v. Department of Social Services*, 436 U.S. 658 (1978).

In this case, the plaintiff does not state what training Wade should have had which, if he had acted accordingly, would have prevented the shooting. Indeed, it is self-evident that there is no need to instruct an officer or prospective police officer not to shoot a person who has his hands up and is not resisting the officer's approach, for any rational person would know this.

9

Certainly there is no evidence that it was official policy to shoot a person who has his hands up and is offering no resistance, or that what the plaintiff states happened to him had happened before and nothing was done about it. As to ratification of Wade's alleged actions, the plaintiff has not referenced any evidence which could constitute ratification of the shooting by Poole under the plaintiff's version of the facts. Poole was not even working for the City at the time.

## Conclusions

For the reasons stated above, Wade's motion for summary judgment is due to be denied, while the City of Snead and Poole's motion for summary judgment is due to be granted. An appropriate order will be entered.

DONE this 5th day of October, 2000.

Robert R. Armstrong, Jr.
United States Magistrate Judge